**Dennis Cunningham**
**Lawyer**
**115-A Bartlett Street**
**San Francisco, CA 94110**
**415-285-8091 / fax 285-8092**

August 3, 2008

Hon. James Larson
United States Magistrate Judge
U.S. Courthouse
San Francisco, CA 94102

Re: <u>Quesada v City of Antioch</u>, No. C-08-1567 JL

Dear Judge Larson:

  On the issue of whether a stay of this action is required, defendants in their letter recite again the elaborate police cover story for the incident they themselves lawlessly fomented at the Club Q, which left the plaintiffs injured and denied their rights as alleged herein, and left three of them facing (false) criminal charges, filed by the police as part of a cover-up. The point here is not the details of the police story but the fact that it is <u>all lies</u>. The truth is, the defendant officers invaded the bar, and insulted, assaulted, beat, Tasered, terrified and (falsely) arrested the plaintiffs, acting under an unconstitutional, covert, racist policy and practice of their Department (and the City of Antioch, under the rule of *Monell*), to harass, threaten, frighten, intimidate, and provoke Black and Latino Antioch residents and visitors — and particularly the owners, employees and clientele of Club Q, including plaintiffs — in order to scare and discourage them from frequenting the bar or otherwise visiting or trying to live in Antioch.
  Plaintiffs thus allege the instant prosecution of three of them is brought in absolute bad faith by the officers, and prosecutors in collusion with them, and they have shown and can further show the racist policy behind it, with, *inter alia*, the recent Report by Public Advocates, a well-respected non-profit civil rights organization (See attached excerpt), and a new federal lawsuit, seeking class action status for some 800 African-Americans, challenging a concerted policy by the Antioch Police Department to target black people for arrest and harassment, and to pressure landlords to evict them from subsidized housing (See attached News Report). So the test for abstention under *Younger v. Harris* is not met, (see dfts' letter, p.6,#3).
  As to the *Heck v Humphrey* issue, we believe it is patently ridiculous to say there can be no actionable excessive force in a case where the plaintiff has been convicted of resisting arrest, because the conviction implies the arrest was lawful and an arrest made with excessive force is inherently unlawful. In many if not most circumstances involving resistance, the arrestable offense is accomplished before the resistance begins; and the excessive force occurs when the officer goes too far in subduing the suspect. Are we to believe, from the precedents presented by the defense, that, if a jury is convinced that the

Page 1 of 2

officer used too much force in subduing the suspect, the arrest is bad and the suspect goes free of the underlying offense for which the arrest was undertaken in the first place? Not likely. Would acquittal of a resisting charge, because too much force was used, establish civil liability for excessive force, and wrongful arrest, as a matter of law? Also not.

In any event, the plaintiffs' position is that *Heck* does not apply, because no conviction has occurred; so a stay is appropriate under *Younger*, or not at all (although it is not clear to us how the bad faith prosecution issue would be resolved, in these circumstances). As a practical matter, defendants complain they would be prejudiced, in the absence of a stay, because "...it is more than likely that Plaintiffs' counsel will object to any (deposition) questions... per the Fifth Amendment..." (dfts' letter, p.8, last paragraph). In point of fact, however, counsel have confirmed that Plaintiffs Quesada, Pugh and Rivera will not assert a Fifth Amendment objection if they are deposed in this case; thus, there is no prejudice to defendants or tactical advantage to plaintiffs in going forward with all the plaintiffs. Obviously there is no substantive basis for a stay as to the three plaintiffs not charged --- who would be prejudiced by a stay --- although there are practical reasons not to divide the case in two, certainly...

To us, it is far from clear that the police should be entitled to the strong strategic advantage of being entitled to go first, *ipso facto*, and thus control the entirety of the legal proceedings arising from this incident, simply because they are the police, and --- with their supervisors and collaborators in the District Attorney's Office --- have no more shame about corrupting the administration of justice than about beating up the plaintiffs in the first place --- or, trying with such shameful measures to keep Antioch lily-white. So we oppose the stay.

              Sincerely,

              __/S/_____
              Dennis Cunningham
              Jai M. Gohel
              Attorneys for plaintiffs

# Policing Low-Income African-American Families in Antioch
## Racial Disparities in "Community Action Team" Practices



**Revised December 18, 2007**

Public Advocates Inc.  BAY AREA LEGAL AID
WORKING TOGETHER FOR JUSTICE

**Public Advocates Inc.** is a non-profit law firm and advocacy organization that challenges the systemic causes of poverty and discrimination by strengthening community voices in public policy and achieving tangible legal victories advancing education, housing and transit equity. Public Advocates focuses on strategic policy reform, collaboration with grassroots groups representing people with low incomes, people of color and immigrants, communication, and litigation, "making rights real" across California since 1971. For more information, see www.publicadvocates.org.

    **Elisabeth Voigt**, Staff Attorney
    **Richard Marcantonio**, Managing Attorney
    **Sam Tepperman-Gelfant**, Attorney and EJW Fellow
    **Wynn Hausser**, Director of Communication


**Bay Area Legal Aid (BayLegal)** is the largest provider of free civil legal services in the Bay Area serving Alameda, Contra Costa, Marin, Napa, San Mateo, San Francisco and Santa Clara counties. Our mission is to provide high quality legal assistance to low-income people, regardless of their location, language or disability. Although grounded in local communities, our vision is to serve in the entire region. BayLegal assists clients primarily in housing, public benefits, health access, and family law/domestic violence. For more information, see www.baylegal.org

    **David Levin**, Staff Attorney
    **Monique Doryland**, Staff Attorney
    **Susun Kim**, Managing Attorney


**Special Thanks To:**

**Professor David L. Banks**, Department of Statistics and Decision Science, Duke University
**Madeline Neighly**, J.D. 2008, UC Berkeley School of Law (Boalt Hall)
**Barbara Thomas**, J.D. 2009, Stanford Law School

*This work is licensed under the Creative Commons Attribution-Noncommercial-No Derivative Works 3.0 United States License.*

# Executive Summary

## Background

The city of Antioch has grown significantly over the past several decades, with its population more than doubling between 1985 and 2005. In the last decade alone, Antioch's population has grown by 30 percent. With this growth the city's racial composition has shifted. Among other things, the city's African-American population nearly doubled between 2000 and 2006.[1]

These demographic changes have coincided with the crash of the real estate and mortgage lending markets. Antioch finds itself at the epicenter of a national foreclosure crisis, with "for sale" signs going up on home after home. Foreclosures threaten the social fabric of the community and drive down home values. The rows of empty homes left behind can pose a threat to public safety.

In response to changes in the housing market, some Antioch homeowners are renting out their single-family homes. This trend generates a much-needed pool of quality rental housing affordable to lower-income families from around the Bay Area, including families who participate in the HUD Section 8 housing assistance program. This same trend holds benefits for longer-term Antioch residents. By helping stem the influx of homes onto the market, these new residents provide some stability in home values. By reducing the number of vacant homes, they also reduce public safety threats.

However, some segments of the community perceive that Section 8 tenants are the cause of an increase in their city's problems. This perception persists despite the absence of any correlation between Antioch's crime rates and the number of Section 8 families living there, and despite clear indications that the real crisis in Antioch is caused by foreclosing mortgage lenders. In July 2006, city officials and the Antioch Police Department (APD) reacted to the outcry from this segment of the community by creating a special unit within the APD, known as the Community Action Team (CAT).

Since then, African-American Section 8 families have reported being targeted by the CAT's activities. They cite examples of CAT officers entering their homes in response to complaints of *non-criminal* activity, such as unkempt lawns and children playing; in some instance, there has been no complaint at all. The tenants also feel their right to housing in Antioch is directly threatened when the CAT sends letters complaining about them to their landlords and to the Housing Authority without any crime or safety justification.

Last July, Public Advocates Inc. and Bay Area Legal Aid set out to investigate these contentions. Specifically, we requested information under the California Public Records Act from the APD about CAT activities, and the race of the families affected by them. Over a period of months, APD provided 750 pages of records, including printouts of computerized "Event Reports" for each closed

CAT case. However, with limited exceptions, it did not provide information about the race of the affected households.

We followed up with a separate request to the Housing Authority of Contra Costa County, which provided approximately 400 pages of documents, as well as statistical data broken down by race, including information by race on Section 8 families that APD referred to the Housing Authority with a request to terminate their Section 8 housing voucher.

Broad demographic data provides the backdrop against which we analyzed this situation. Overall, 75 percent of homes in Antioch are owner-occupied. The remaining 25 percent are renter-occupied homes, including a small fraction of homes in the city — 5 percent — that are rented to families that participate in the Section 8 program.[2] *(See Figure 1, page 17.)*

Most Antioch homeowners and non-Section 8 tenants are White, while most Section 8 households in Antioch are African-American. Of homeowners, 58 percent are White, and 14 percent are African-American. Of renters, 54 percent are White, and 14 percent are African-American.[3] By contrast, 56 percent of Section 8 households in Antioch are African-American, while only 39 percent are White. *(See Figure 2, page 18.)*

Because race-specific data from the Police Department was not provided, we conducted a two-step inquiry. First, we analyzed the extent to which CAT police practices scrutinized Section 8 families, and how heavily the impact of those practices was likely to fall on African-American families. For this portion of our analysis, we assumed that CAT activity is race-neutral – that is, that the CAT did not specifically profile African-Americans.

We then asked a separate question: whether there was any evidence that the CAT did, in fact, single out African-American families for special scrutiny.

## Summary of Findings

On the first question, we confirmed that the CAT is serving its stated purpose of focusing on Section 8 tenants. As a result, even assuming that they are not being specifically profiled, **African-American families are likely to be subjected to adverse CAT practices at a far higher rate than White families**. For instance, African-American households in Antioch are approximately **four times more likely** than White households to be:

- The subject of a CAT case
- Subjected to a search or investigated by the CAT
- Searched or investigated by the CAT based on a purely non-criminal complaint
- Subjected to a letter from the Police Department to their landlord complaining of their conduct

*Policing Low-Income African-American Families in Antioch*

In short, there is reason to believe that **scrutiny of Section 8 families may serve as a proxy for scrutiny of low-income African-American families**.

On the second question, our findings suggest that **CAT practices are *not* race neutral**. We found two trends that lead us to conclude that CAT practices over-select African-American families, even within the disproportionately African-American Section 8 population.

First, while 56 percent of all Section 8 families in Antioch are African-American, 70 percent of the families about which CAT has submitted complaints to the Housing Authority are African-American. The explanation for the disparity does not appear to lie in the illegitimate conduct of the tenants. Rather, Section 8 termination rates indicate that a significantly higher rate of referrals to the Housing Authority for termination that lack merit are made with respect to African-American families than to White families.

Second, we found that the complaints the CAT submitted to the Housing Authority are focused much more heavily in the more affluent southeastern side of town (ZIP Code 94531), where African-American families comprise 78 percent of Section 8 households. There, CAT has referred nine percent of all Section 8 families for termination, compared with only three percent on the northwestern side, where 51 percent of Section 8 households are African-American.

This data is particularly troubling for two reasons: First, it provides *indirect* evidence that CAT practices are **not race-neutral, but rather single out African-American families**. Second, it provides *direct* evidence that the CAT is **interfering with the housing rights of law-abiding African-American families in Antioch**.

The nature of the issues that trigger CAT intervention also inform our findings. Interpreted conservatively, police records suggest that nearly 40 percent of CAT residential cases have responded to complaints of **purely non-criminal activity**.[4] This may be due to the fact that the CAT operates without a written set of policies and procedures to focus its activities on legitimate law-enforcement matters.

Looking at the whole picture, and based on our analysis of the available data, we conclude that **the practices of the CAT disproportionately affect African-American families**. We further conclude that **the CAT has singled out African-American families within the Section 8 population in an attempt to terminate their housing assistance**.

# Recommendations

Antioch public officials should be working to integrate the city's newest residents and to build a stronger community. Phase II of this report, to be published in the coming months, will put forth specific policy recommendations to assist the city with this process.

In the meantime, we recommend that the city take the following steps:

1. End the CAT's practice of policing non-criminal conduct and instead refer calls regarding non-criminal conduct to the appropriate public agencies, such as the Office of Code Enforcement.
2. Adopt official policies and procedures that govern the CAT and monitor adherence to these policies, to ensure that racial profiling is not occurring.
3. Ensure that CAT officers receive appropriate training in those policies and procedures.
4. Require the APD to collect and maintain racial demographic information with regard to CAT contacts, and all police practices.
5. Establish a community policing program built on community trust and partnership.
6. Establish community mediation and integration programs.

Antioch is, indeed, undergoing a crisis, but its Section 8 families are not the cause of that crisis. The crisis is one of integrating new residents into the fabric of a community that is being torn apart by real estate and mortgage financing forces. The available data indicates that Antioch's program to police its Section 8 residents has an enormously disproportionate impact on African-Americans. The city should be adopting a constructive approach. Rather than sweeping its predominantly African-American Section 8 neighbors into a law-enforcement program, it should be working to integrate Antioch's newest residents into the community, building a stronger community for all regardless of race, ethnicity or economic status.

San Francisco Chronicle
July 17, 2008

## ANTIOCH

# Blacks sue – say city is biased

**By Bob Egelko**
CHRONICLE STAFF WRITER

A group of African American, low-income tenants accused the city of Antioch in a lawsuit Wednesday of trying to drive them out of federally subsidized housing by creating a police squad to target blacks for arrests, harassment and pressure on their landlords to evict them.

As more black families have been drawn to affordable housing in the Contra Costa County community, "the city has reacted with alarm and hostility to the newcomers, choosing to scapegoat them as the cause of economic downturn," lawyers for five renters declared in papers filed in federal court in San Francisco.

At a news conference, tenants said police had entered and searched their homes without warrants or any evidence of crimes, had warned their landlords that they could be held responsible for tenants' misconduct, and had asked the county housing authority to eliminate the Section 8 subsidies that kept their rents affordable.

One plaintiff's landlord, Riaz Patras, said at the news conference that an Antioch police officer advised him last year not to rent to African Americans.

The suit alleges that the police Community Action Team, established in July 2006 to patrol high-crime neighborhoods, has violated state and federal laws and constitutional guarantees against racial discrimination and illegal searches. Antioch officials vehemently denied the allegations.

"Any objective review of our city's policing efforts will reveal that these efforts are focused exclusively on criminal and/or dangerous behavior," the city said in a statement.

The suit, an expansion of a case filed by four of the plaintiffs last month, seeks class-action status on behalf of about 800 African Americans with Section 8 housing subsidies in Antioch. It seeks damages for the individual plaintiffs and court orders against unfounded searches and harassment.

Lawyers for the plaintiffs said city leaders have reacted fearfully to the near-doubling of Antioch's African American population in the last five years. Black people now make up about 15 percent of the city's 101,000 residents.

The suit quoted City Council members as saying at meetings in 2006 and 2007 that they were determined to keep Antioch from becoming as violent as Richmond and blamed problems on an influx of Section 8 renters, most of whom are black. Plaintiffs' lawyer Brad Seligman said Police Chief James Hyde has encouraged residents at neighborhood meetings to file complaints against Section 8 residents.

Two-thirds of the Community Action Team investigations focus on African Americans, the plaintiffs' lawyers said, and black households are the targets of 70 percent of police complaints to the Housing Authority — which, the lawyers said, finds a majority of such complaints unfounded.

Police "invaded my home and terrorized my family," plaintiff Karen Coleman said at the news conference. "They told me my Section 8 benefits were going to be terminated."

The lawsuit alleged that four officers came to Coleman's door in June 2007, saying they were looking for her husband, a parolee, and entered over her objections. They searched the home, took pictures, handcuffed her when she tried to call 911 and threatened to handcuff her 12-year-old son, the suit said.

Officers visited twice more in the following month, went to her husband's workplace three times, wrote to her landlord and contacted the Housing Authority in an unsuccessful attempt to evict her, the suit said.

The city did not respond to specific allegations in the suit but said the Community Action Team was engaged in crime-fighting, not discrimination.

"The team brings neighborhoods and police into partnership to resolve issues involving violent crime, narcotics activity, dangerous or substandard structures and sanitation issues," the city's statement said. "Antioch residents of every background have credited the Community Action Team with helping to restore the safety and security of their neighborhoods, parks, streets and homes."

---

E-mail Bob Egelko at begelko@sfchronicle.com.

